## IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
## TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

| | |
|---|---|
| **JULIO ALONZO ALVAREZ**<br>**CHOC ex rel. MATEO BA TUT and**<br>**AURELIA CHE CUZ DE BA,** | ) <br> ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> )     **Civil Action No. _____** |
| **v.** | )     **JURY DEMANDED**<br> ) |
| **METROPOLITAN GOVERNMENT OF**<br>**NASHVILLE & DAVIDSON COUNTY,**<br>**TENNESSEE;** | ) <br> ) <br> ) <br> ) |
| **and** | ) <br> ) |
| **METRO NASHVILLE PUBLIC SCHOOLS;** | ) <br> ) |
| **and** | ) <br> ) |
| **ESKOLA LLC;** | ) <br> ) |
| **and** | ) <br> ) |
| **JR. ROOFING & CONSTRUCTION LLC;** | ) <br> ) |
| **and,** | ) <br> ) |
| **BUILDERS MUTUAL INSURANCE**<br>**COMPANY,** | ) <br> ) <br> ) |
| **Defendants.** | ) |

## COMPLAINT

Come now the Plaintiffs, Mateo Ba Tut and Aurelia Che Cuz de Ba, parents of young Denis Ba Che, by and through their representative Julio Alonzo Alvarez Choc, complaining against Defendants for causing the wrongful death of their beloved son, 20-year-old Denis Ba Che, by their discriminatory and other abusive practices, and would allege as follows:

1

## PARTIES

1.      Plaintiffs Mateo Ba Tut and Aurelia Che Cuz de Ba (hereinafter collectively "Parents"") are the father and mother, respectively, and next of kin of decedent Denis Ba Che (hereinafter "Denis"). Parents are both residents of Guatemala.

2.      Parents have given broad power of attorney to their family member, Plaintiff Julio Alonzo Alvarez Choc, who brings this action in his capacity as attorney-in-fact on Parents' behalf. He is currently a resident of Ohio.

3.      Defendant Metropolitan Government of Nashville & Davidson County, Tennessee ("Metro") is a municipal entity and a political subdivision of the State of Tennessee.

4.      Defendant Metro Nashville Public Schools ("MNPS") is the municipal school system for Metro established by Article 9 of the Metro Charter. MNPS is governed by the Metropolitan Board of Public Education in accordance with State law and municipal ordinance.

5.      Defendant Eskola LLC ("Eskola") is a Tennessee limited liability company engaged in general contracting work in the construction industry throughout the State of Tennessee, with its principal office located at 2418 N. Morelock Road, Morristown, TN 37814. Eskola can be served via its registered agent, Jon Eskola, at the same address.

6.      Defendant Jr. Roofing & Construction LLC ("Jr. Roofing") is a Tennessee limited liability company engaged in the supply of labor in the roofing industry, with its principal office located at 509 Bel Air Drive, Nashville, TN 37217. It can be served via its registered agent, Eleazar Morales Vasquez, at the same address.

7.      Defendant Builders Mutual Insurance Company is an insurance company providing coverage for entities engaged in the construction industry, including in Tennessee.

2

## FACTUAL BACKGROUND

1. Plaintiffs complain of the wrongful and premature death of young Denis Geovani Ba Che, who died after falling through the roof of Glencliff High School. He was 20 years old.

2. Denis, who grew up in rural Guatemala, came to Nashville only a few weeks before his tragic death in search of work to help support his parents and family back in Guatemala. Denis was alone in Nashville, with no family, no means of transportation, and a significant language barrier. Denis was young and vulnerable; Defendants all exploited his situation to their financial benefit. Denis's race and his death are inextricably linked in this case.

3. Denis found work with Defendant Jr. Roofing, which company transported him to different jobsites each day to perform roofing work for prime contractors. He had no skills or training in roofing work. He had no training or knowledge of safety practices in this dangerous occupation.

4. Denis worked from 6:00am to 6:00pm either five (5) or six (6) days per week. Jr. Roofing paid him $16 per hour for his work every week by check. He was paid straight time with no overtime pay for hours worked over 40 per week.

5. On October 12, 2023, a Jr. Roofing foreman picked up Denis at his apartment and dropped him off at Glencliff High School to work for the day. Denis was to remove old, damaged roofing material from the exterior of the high school's building.

6. Upon information and belief, Jr. Roofing has approximately 40 employees working at any given time. On the day in question, Jr. Roofing supplied approximately 10-15 laborers to work for Eskola on the Glencliff High School site.

7. Once Jr. Roofing dropped Denis and his co-workers at the jobsite, they were supervised during the day by an employee of Eskola, who controlled every aspect of their work.

3

8.    MNPS and Eskola prevented Denis and Jr. Roofing from accessing the interior of the school to inspect the condition of the roof. Simply going into the school gymnasium and looking up, on that day, would have revealed to even a lay observer the open and obvious holes and fissures in the roof caused by years of unrectified water damage.

9.    However, from the exterior, the extremely degraded condition of the roof was not apparent because the roof was covered by a vinyl membrane that concealed the roof's defects.

10.    Eskola knew of the hazardous condition of the roof before beginning work but chose not to perform an inspection of the interior of the roof to help assess damage.

11.    Nevertheless, and with no training and no harness, Defendants Jr. Roofing and Eskola sent young Denis up onto the roof on October 12th to work. At one point, he unknowingly stepped on a concealed cavity in the roof. Denis fell through the roof, bouncing off air ducts and piping on his way down, until he hit the gymnasium floor below where he died in a pool of his own blood. His face was so disfigured from the fall that his body could not be identified with photographs.

12.    It is no coincidence that young Denis looked a lot like many of the students at Glencliff High School. Glencliff is a majority Latino school. Metro and MNPS have systematically neglected, underfunded and cut corners to save money in the maintenance of Glencliff and other majority-Latino schools in the Glencliff cluster and nearby.

13.    The roof at Glencliff had been damaged and leaking for years. Faculty resorted to using trash cans to catch the water coming down into hallways and common areas, and the roof itself continued to erode with water damage and years of neglect.

14.    Finally, in February 2023, MNPS solicited bids to replace the Glencliff roof. MNPS utilizes a lowest-bidder selection process.

4

15.     MNPS declined to include any requirements or criteria addressing site or project safety, safety practices, or safety records in its Request for Quotation soliciting bids for the Glencliff roof replacement.

16.     MNPS selected Eskola from the responsive bidders. Upon information and belief, MNPS did not ask Eskola about their safety record as part of the bidding process. If it had, it may have learned that Eskola has a record of using cheap, unskilled workers, such as temp workers and immigrants, and a poor safety history. It may have even learned that mere weeks before MNPS entered into the contract with Eskola for the Glencliff work, the Tennessee Occupational Safety and Health Administration had opened an inspection into Eskola's safety compliance on another project in Nashville. That inspection ultimately led to the issuance of multiple citations against Eskola that TOSHA classified as "serious," which refers to situations in which there is a substantial probability that death or serious physical harm could result from a hazard about which the employer knew or should have known.

17.     MNPS executed a contract with Eskola for replacement of the roof at Glencliff High School (the "Project") in April 2023. The contract does not require Eskola to have a site-specific safety plan or any safety plan or program at all, nor to have a safety monitor, or to take any other safety measures in its work on the Project.

18.     Any minimal information about the hazardous condition of the roof that was communicated from MNPS to Eskola was not given to the workers performing work on the roof.

19.     During the course of work, Eskola utilized at least 3 low-road subcontractors to provide cheap labor for the project, including Jr. Roofing. MNPS knew about these entities.

20.     In addition to young Denis, it appears that some of the workers on the roof that fateful day in October were minor children under 18 and that MNPS knew or had reason to know about the presence of minors on this project. Based on information and belief, MNPS and Metro

5

have had instances of child labor on their worksites in the past and have done nothing to remediate the situation.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/GROSS NEGLIGENCE
*Plaintiffs against Defendants Metro, MNPS, Eskola and Jr. Roofing*

21.     Plaintiffs incorporate by reference and re-allege each and every preceding allegation, as though fully set forth herein.

22.     Defendants owed a duty of care to all workers on the Project, including young Denis, to provide and maintain a safe workplace free of hazards or with adequate safety measures to remediate inherent hazards.

23.     Defendants owed a duty of care to all workers on the Project, including young Denis, to follow all applicable laws, codes, and industry standards on the Project.

24.     Defendants owed a duty of care to all workers on the Project, including young Denis, to assess completely the condition of the roof before commencing work and to communicate hazards discovered in that assessment to all workers on the Project.

25.     Defendants owed a duty of care to all workers on the Project, including young Denis, to provide adequate PPE, training, and other general safety measures on the Project.

26.     Because of the inherent danger in working on roofs at great heights, coupled with the extremely degraded condition of the roof at Glencliff, it was foreseeable that a worker would be injured, as Denis was, due to Defendants' actions and inactions described herein. As such, Defendants had a duty to refrain from the misfeasance and nonfeasance described herein.

27.     Defendants breached these duties by failing to assess and warn workers of severe hazards on the Project, particularly those that were not visible to workers on the roof, and such negligence proximately caused the accident and injuries to Denis.

28.     Defendants further breached these duties by failing to provide personal fall protection equipment to workers on the Project, in compliance with applicable regulations and industry standards, and such negligence proximately caused the accident and injuries to Denis.

29.     Defendants further breached these duties by failing to implement any type of safety protocol on the Project, failing to train workers on fall hazards and other particularized hazards on the Project, and otherwise failing to ensure even a basic level of safety on the Project, and such negligence proximately caused the accident and injuries to Denis.

30.     The hazardous condition of the roof was known to MNPS, but MNPS failed to communicate the details of the condition to Eskola, Jr. Roofing, or the workers on the Project. In fact, MNPS actively prevented these individuals from accessing the interior of the school building to perform inspections. MNPS's actions and inactions make it liable for injuries that occurred on its premises.

31.     For their part, Eskola and Jr. Roofing would have discovered the hazardous condition of the roof had they engaged in a proper inspection of both the exterior and interior of the roof. Their actions and inactions make them liable for injuries that occurred on the Project.

32.     Denis's death would not have occurred but for Defendants' grossly negligent, reckless, and willful conduct. Denis's injuries and death are the natural and probable consequence of the Defendants' acts of misfeasance and nonfeasance.

33.     Defendants' actions and inactions constitute a pattern of gross negligence, recklessness, and malicious conduct carried out with a flagrant disregard for the rights and safety

7

of workers on the Project, including Denis. As such, Defendants are liable to Plaintiffs for punitive and exemplary damages.

34.    As a result of Defendants' actions described herein, Denis sustained lost wages, lost earning capacity, and loss of enjoyment of life, as well as pain and suffering in his fall and the moments leading up to his death. Defendants are liable for those damages.

35.    As a result of Defendants' actions described herein, Parents have been denied the affection and companionship of their child, whom they loved and adored. They have also suffered the loss of economic support that Denis provided his family back in Guatemala. Defendants are liable for Parents' loss of consortium and other damages.

36.    The rights of action contained herein do not abate as a result of young Denis's death, but pass to his next of kin, his parents, pursuant to Tenn. Code Ann. § 20-5-106.

## COUNT II
## NEGLIGENCE PER SE
*Plaintiffs against Defendants Metro, MNPS, Eskola and Jr. Roofing*

37.    Plaintiffs incorporate by reference and re-allege each and every preceding allegation, as though fully set forth herein.

38.    State and federal laws govern the prevention of falls roofs and other work sites above ground level, such as the Project; safety and training on such sites; and the protection of children working on such a work site. Defendants violated numerous such laws.

39.    Various regulations mandate training and equipment to protect workers from falls. Defendants violated these regulatory safety mandates by providing no training and no personal fall protection equipment to Denis.

8

40.     Further, U.S. Department of Labor Hazardous Occupation Orders prevent children from performing work on or about a roof. Defendants violated these *per se* child labor prohibitions by suffering and permitting Denis's colleagues to perform such prohibited work.

41.     Defendants are in violation of the duties established by federal and state regulation governing the safe and proper performance of work at elevated heights, which violations caused Denis's death. The violations of said mandates constitute negligence *per se*.

42.     As a result of Defendants' actions described herein, Denis sustained lost wages, lost earning capacity, and loss of enjoyment of life, as well as pain and suffering in his fall and moments leading up to his death. Defendants are liable for those damages.

43.     As a result of Defendants' actions described herein, Parents have been denied the affection and companionship of their child, whom they loved and adored. They have also suffered the loss of economic support that Denis provided his family back in Guatemala. Defendants are liable for Parents' loss of consortium and other damages.

44.     The rights of action contained herein do not abate as a result of young Denis's death, but pass to his next of kin, his parents, pursuant to Tenn. Code Ann. § 20-5-106.

## COUNT III
## FAIR LABOR STANDARDS ACT
*Plaintiffs against Defendants Eskola and Jr. Roofing*

45.     Plaintiffs incorporate by reference and re-allege each and every preceding allegation, as though fully set forth herein.

46.     At all times relevant, Denis and his co-workers were employed by Defendants Eskola and Jr. Roofing to perform roofing work on the Glencliff Project and other projects within the last three (3) years. Plaintiffs bring their FLSA claims as an opt-in collective action on behalf of Denis and all other similarly situated employees pursuant to 29 U.S.C. § 216(b).

9

47. Upon information and belief, Defendants Eskola and Jr. Roofing both have an annual dollar volume of sales that now exceeds and has exceeded $500,000.00 at all times relevant to this Complaint. Defendants bid on and engage in construction projects across multiple states and their business operations substantially affect interstate commerce.

48. Defendants are statutory and/or joint employers operating covered enterprises, as defined by 29 U.S.C. § 203, and are otherwise covered by and subject to the FLSA.

49. At all times relevant, Plaintiffs and members of both collective groups were employees of Defendants, as defined by 29 U.S.C. § 203.

50. Plaintiffs and the collective group members do not qualify as exempt employees, as defined by the FLSA or applicable Federal regulations.

51. Defendants failed to pay Denis and all similarly situated employees one and one-half times their regular hourly rate for all hours worked in excess of forty (40) per week during the relevant period.

52. Defendants also required Denis and all similarly situated employees to pay for small tools and other materials that should have been provided by the employers, thereby reducing their actual wage below the legally required minimum wage and overtime wage rate.

53. Denis and the collective group members are similarly situated, perform substantially similar labor for Defendants and are subject to Defendants' common employment practices and policies.

54. Defendants have willfully and intentionally engaged in a knowing and continuous pattern and practice of violating the FLSA, as detailed herein, by failing to properly compensate Denis and the collective group members.

55. As a result of Defendants' unlawful acts, Plaintiffs and collective group members have been deprived of regular rate compensation and overtime compensation in amounts to be

10

determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216.

56.    Defendants have violated Sections 6 and 7 of the FLSA by failing to comply with federal minimum wage and maximum hour requirements.

57.    As a result of Defendants' unlawful conduct, Denis and collective group members have suffered and continue to suffer harm, including but not limited to lost wages and other financial loss.

## COUNT IV
## UNJUST ENRICHMENT
*Plaintiffs against Defendants MNPS and Eskola*

58.    Plaintiffs incorporate by reference and re-allege each and every preceding allegation, as though fully set forth herein.

59.    The safety of Nashville's children should be MNPS's first priority. To that end, MNPS requires the employees of direct contractors, like Eskola, to undergo background checks and other measures before accessing MNPS property in the physical proximity of students.

60.    However, MNPS places no controls whatsoever on the employees of subcontractors. To the contrary, MNPS's procurement process incentivizes contractors to subcontract labor in the cheapest manner possible by cutting safety and security measures.

61.    As such, MNPS and its direct contractors, such as Eskola, reap the economic benefit of incentivizing unsafe working conditions on public properties. Both entities have been unjustly enriched by stealing wages from workers and exposing workers to bodily harm at work.

62.    Plaintiffs bring this claim as an opt-out class action on behalf of Denis and all others who worked, work, or will work on the Project for Eskola through any subcontractor (collectively the "Class" and each member a "Class Member").

11

63.    Denis and the Class Members furnished Defendants with valuable services, *i.e.* their labor, undertaken for Defendants' disproportionate profit at far less than the legally mandated minimum wage, which labor Defendants accepted and continue to accept, under circumstances which would render it unjust for Defendants not to pay Plaintiffs and the Class the full value of that labor.

64.    Denis and the Class Members worked in inherently unsafe and hazardous working conditions created by Defendants. Those conditions were completely preventable and remediable; however, Defendants chose to ignore obvious hazards in order to cut costs on safety measures for workers. It would be inherently unjust for Defendants to retain the benefit of those bad acts taken at Class Members' expense.

65.    The number and identity of the Class Members are readily ascertainable from the business records of Eskola and its subcontractors on the Project.

66.    Each Class Member's work assignments, hours, and rates of pay are also determinable from the employers' business records. Notice can be provided by means permissible under Tenn. R. Civ. P. 23.03.

67.    The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Plaintiffs believe the Class to number at least fifty (50) people and possibly more.

68.    Plaintiffs' claims are typical of those claims which could be alleged by any member of the Class, and the relief sought is typical of the relief which would be sought by any member of the Class in a separate action.

69.    Questions of law and fact common to the Class as a whole predominate over any questions affecting only individual Class Members. The questions of law and fact common to the Class include, but are not limited to, the following:

12

> a. Whether MNPS's procurement process incentivizes abusive employment
> practices by bidders;
>
> b. Whether MNPS and Eskola received an economic benefit from the
> subcontractors' wage and hour violations and substandard safety practices;
>
> c. Whether it would be unjust to allow MNPS and Eskola to retain the benefit of
> the abusive employment practices utilized on public projects at the Class
> Members' expense; and
>
> d. Whether non-wage remedies, such as disgorgement of profits, are appropriate.

70. Defendants treated all Class Members in a uniform manner regardless of the subcontractor referring them. Denis and other Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures.

71. Plaintiffs are able to and will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiffs are represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour and related cases.

72. A class action is superior to other available methods for the fair and efficient adjudication of the controversy — particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants as individuals. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

73. The adjudication of individual litigation claims would result in a great expenditure of court and public resources. Treating the claims as a class action would result in a

13

significant savings of these costs. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent and/or varying adjudications, establishing incompatible standards of conduct for MNPS and result in the impairment of Class Members' rights. Rather, because all the issues before the Court are common and could be fairly determined in a class action context, the class action is superior to any the other available method of adjudication. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action, including subclassing.

74.     Given the inequities between the parties, the lack of sophistication and vulnerability of many of the Class Members, and the amount of the profits to Defendants at the expense of the Class Members, it would be unjust for Defendants to be allowed to retain the benefit of its policies and practices without compensation to the Plaintiffs and the Class.

## COUNT V
## CIVIL RIGHTS VIOLATIONS BASED ON
## RACE DISCRIMINATION
*All Plaintiffs against Metro, MNPS, and Eskola*

75.     Plaintiffs incorporate by reference and re-allege each and every preceding allegation, as though fully set forth herein.

76.     Young Denis's tragic death is, in many ways, the natural and foreseeable consequence of MNPS's discriminatory underfunding of majority-Latino schools in the district.

77.     MNPS has its own budget and manages its own procurement process for services such as facilities maintenance and repair. MNPS has substantial discretion in allocating monies in its budget to particular schools for particular purposes.

78.     MNPS intentionally withholds much-needed funding from majority-Latino schools in the district, particularly those within School Board District 7. MNPS chooses to provide less funding to facilities maintenance, upkeep and repair to majority-Latino schools than to other schools due to race-based animus against Latino students and residents in the district.

14

79. For example, at Una Elementary (57% Latino) and Wright Middle School (70% Latino), MNPS has intentionally underfunded contracts for janitorial and custodial services. Further, MNPS has intentionally left serious building maintenance and repair issues unaddressed at both Glencliff Elementary (70% Latino) and Glencliff High (70% Latino).

80. In fact, the Project is illustrative of MNPS's discriminatory practices. While MNPS eventually allocated funds to repair the roof at Glencliff High School in 2023, it so underfunded the project that the resulting quality of the new roof is little better than the old one. Despite Eskola's work on the Project, the roof at Glencliff still leaks and faculty still use trash cans to catch water coming into the building from the roof.

81. Similarly, in the fall of 2023, around the same time Eskola was doing roofing work, MNPS contracted with a HVAC company to repair the heat and air system at Glencliff High School. However, MNPS so underfunded the project that the resulting quality of the new HVAC system is little better than the old one. Throughout the last several weeks of the Spring 2024 semester, students and teachers at Glencliff have been forced to endure 90+ degree heat in the building at times during the school day.

82. MNPS does not similarly underfund majority-White schools in the district.

83. MNPS's race-based funding practices for facilities maintenance create unsafe environments not only for students but also for workers like Denis. The unsafe working conditions on the Project are the result of MNPS's discriminatory funding of Latino schools.

84. Latinos account for approximately 11% of Nashville's population, yet here and statewide, Latinos account for a majority (approximately 52%) of construction laborers. Accordingly, MNPS policies and customs around its construction procurement processes, particularly as they relate to onsite safety practices and enforcement, disproportionately impact Latinos.

15

85.     MNPS's race-based funding practices denied Denis, himself a Latino and member of a protected class, the full and equal protection and benefit of our framework of state and federal laws that guarantee all people the right to a safe workplace, certain safety protections in the employment relationship, and employment free of invidious discrimination.

86.     In addition to MNPS's annual budget, per the Charter, Metro has the ability to provide additional funds to MNPS, when needed, for the maintenance and operation of schools.

87.     Further, Metro provides significant funding for MNPS as the annual MNPS budget comes out of the overall Metro Government budget. Accordingly, even though MNPS operates independently, the Metro Government provides an oversight role as to MNPS.

88.     MNPS and Metro also coordinate on issues impacting education and community welfare, such as grants, capital improvements, and the community planning process, and have a history of working together to ensure that MNPS policies and planning efforts are aligned with the broader goals of Metro.

89.     Upon information and belief, Metro knew about the insufferable conditions at Glencliff and other majority-Latino schools but made the intentional decision not to provide additional funding to improve the schools, due at least in part to discriminatory animus.

90.     The hazards on the Project were a municipally created danger for which MNPS is liable. Because it knew of the deteriorated conditions of the roof at Glencliff but prevented others from fully and adequately inspecting the conditions of the roof prior to starting work, MNPS had an affirmative duty to protect workers like Denis, and its failure to do so deprived Denis of his life, liberty and property without due process of law.

91.     Defendants, both individually and collectively, negligently and intentionally failed to maintain the Glencliff roof. Both this failure to maintain the roof and MNPS's failure to warn of if not remediate the danger that was open and obvious to MNPS and yet concealed as to

16

Denis and his fellow workers that day are a direct result of Defendants' custom and policy to apply a race-based funding scheme that underfunds majority Latino schools like Glencliff. In practice, that custom and policy operates in such a manner that is racially and ethnically discriminatory against the predominantly Latino student population at Glencliff.

92. Similarly, Defendants, both individually and collectively, negligently and intentionally conspired along with the other named Defendants to institute and maintain procurement customs and policies that willfully ignore the safety practices and histories of contractors participating in the bidding process. The failure to ensure MNPS contractors meet minimum safety standards is a direct result of these customs and policies that intentionally forsake construction laborers, a majority Latino population. In practice, such customs and policies operate in such a manner that is racially and ethnically discriminatory against predominantly Latino construction laborers, including young Denis who lost his life as a result.

93. The actions and inactions of Metro and MNPS described herein violate 42 U.S.C. §§ 1981, 1983, 1985, and the 14th Amendment of the U.S. Constitution.

94. Additionally, Defendants Eskola, Metro, and MNPS, acting in concert, unlawfully interfered with Denis's civil rights in violation of 42 U.S.C. § 1985(3). By continuing to award Eskola steady and regular business, Metro and MNPS conspired with Eskola to cut corners, willfully ignore laws and regulations intended to protect workers, and exploit construction laborers like Denis for their own benefit. Behind this conspiracy to deprive Denis and others like him of equal protection, or equal privileges or immunities of the laws, was intentional racial discrimination against the predominantly Latino construction laborers. As a result, Denis was deprived not only of his rights and privileges under the law but of his very life.

17

## COUNT VI
## DISCRIMINATORY ABUSE OF PROCESS
*Plaintiffs against Defendant Builders Mutual*

95.     Plaintiffs incorporate by reference and re-allege each and every preceding allegation, as though fully set forth herein.

96.     To the extent any Defendant raises workers' compensation exclusivity as an affirmative defense to any of the causes of action alleged herein, Plaintiffs assert a claim for abuse of process per Tennessee common law and a claim of discrimination per 42 U.S.C. § 1981 against Defendant Builders Mutual Insurance Company ("Builders").

97.     Immediately after Denis's death, Plaintiffs, through counsel, asked Builders for details about Jr. Roofing's insurance policies and whether there was coverage for Denis's death.

98.     Despite multiple requests, Builders refused to provide any information to Plaintiffs about coverage.

99.     Rules promulgated by the Tennessee Bureau of Workers Compensation require insurers to make decisions on compensability of an injury within fifteen (15) days of notice.

100.    Builders intentionally flouted this requirement and as a result, Plaintiffs were forced to crowd-fund the funeral and other expenses necessary to transport young Denis's body back to his hometown in Guatemala.

101.    The Workers' Compensation Act provides workers the right to elect to proceed in tort when employers and/or their insurers fail or refuse to comply with requirements in the Act. To the extent Builders makes or has made any offer of statutory benefits under the Act, it did so only after learning of Plaintiffs' decision to elect to proceed in tort with their claims.

102.    Thus, any assertion of compensability is made with the ulterior motive of depriving Plaintiffs of their statutory and constitutional right to have their claims heard in court.

18

103.     The exclusive remedy provision of the Tennessee Workers' Compensation Law, as amended, Tenn. Code Ann. § 50-6-108 (2014), is an unconstitutional deprivation of Plaintiffs' constitutionally protected right to access the Courts and to have their claims tried by a jury.

104.     Builders has a pattern and practice of engaging in such abusive claims practices when the injured parties are Latinos, like Denis. It does so with the discriminatory intention of depriving Latino claimants of equal benefits provided by contract and by law and equal access to the courts and the justice system to enforce their contractual and other rights. This racial animus motivated Builders' abuse of process in this case in violation of Plaintiffs' civil rights.

**WHEREFORE,** *having fully complained, the Plaintiffs pray:*

1.     That process issue and cause the Defendants to answer.

2.     That Plaintiffs have and recover a judgment for damages as described herein for the injuries to and for the wrongful death of their beloved son, including but not limited to his mental and physical pain, the loss of value of his life and his lost earning capacity, and funeral and other resultant expenses in an amount to be determined by a jury.

3.     That Plaintiffs have and recover a judgment for their own loss of consortium and mental anguish caused by the loss of their beloved son in an amount to be determined by a jury.

4.     That Plaintiffs have and recover punitive or exemplary damages in an amount to be determined by a jury.

5.     That the court award such further relief to which Plaintiffs, on their own behalf and/or on behalf of their son, are entitled.

WHEREFORE, Plaintiff prays for judgment against Defendants for compensatory damages and punitive damages in an amount to be determined by a jury after trial, plus costs and attorneys' fees, and for such other and further damages and relief as this Court may deem appropriate.

19

Respectfully submitted:

Kerry Lee Dietz, BPR No. 035112
Michael G. Stewart, BPR No. 016920
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
kdietz@stranchlaw.com
mstewart@stranchlaw.com
Tel: (615) 254-8801

*Attorneys for Plaintiffs*